**TRUCKEE–CARSON IRRIGATION DISTRICT, Plaintiff-Appellant,**

v.

**SECRETARY OF DEPARTMENT OF INTERIOR, Defendant-Appellee,**

and

**Pyramid Lake Paiute Tribe of Indians, Defendant-Intervenor-Appellee.**

No. 83–2351.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 1984.

Decided Sept. 10, 1984.

Frederick G. Girard, Janet K. Goldsmith, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, Cal., for plaintiff-appellant.

Albert M. Ferlo, Jr., Dept. of Justice, Washington, D.C., Scott B. McElroy, Atty., Cogswell & Wehrle, Denver, Colo., Michael R. Thorp, Eisenhower, Carlson, Newlands, Reha, Henriot & Quinn, Tacoma, Wash., for defendant-appellee.

Before SNEED and FLETCHER, Circuit Judges, and BURNS *, District Judge.

SNEED, Circuit Judge:

This case is another chapter in the long story about the legal relationships pertaining to the waters of the Truckee River. Truckee-Carson Irrigation District (TCID) in this case seeks an injunction prohibiting the Secretary of the Interior (Secretary) from terminating TCID's contract to oper-

---

* Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

ate the Newlands Reclamation Project. The Secretary terminated the contract due to TCID's violation of operating criteria related to the Project. TCID's suit also sought a declaration that the operating criteria are invalid. The district court held for the Secretary and TCID appealed. We affirm.

## I.

## BACKGROUND

In its natural state, the Truckee River flowed into Pyramid Lake, which, like most Nevada lakes, has no outlet. Early in this century, however, the United States built the Newlands Reclamation Project under the Reclamation Act of 1902. This project diverts water from the Truckee River into the Truckee Canal at Derby Dam. The diverted water flows through the Truckee Canal into Lahontan Reservoir, where it is merged with water from the Carson River. Of course, any water that is diverted into Lahontan Reservoir does not enter Pyramid Lake. Water from Lahontan Reservoir is used to irrigate the farms in the TCID.

Pyramid Lake is located on the Pyramid Lake Indian Reservation, which is inhabited by the Pyramid Lake Paiute Tribe (Tribe). Drainage from the Truckee River into Lahontan Reservoir has significantly reduced the size of Pyramid Lake. This reduction in size has endangered the fish that inhabit the lake. Because the Tribe relies on the lake's fishery for at least a portion of its livelihood, it is interested in having as much water as possible enter Pyramid Lake. Of course, any water that enters Pyramid Lake does not enter Lahontan Reservoir and is not available to irrigate farms in the TCID. Thus, the interests of the Tribe directly conflict with the interests of TCID and the farmers who rely on Lahontan Reservoir water.

Before the Newlands Project was built, several private landowners had established rights to Truckee River water. In 1913, the federal government sued on behalf of both the project and the Pyramid Lake Reservation in order to establish their rights to Truckee River water for irrigation purposes. (TCID did not exist at that time.) *See Nevada v. United States*, 463 U.S. 110, 103 S.Ct. 2906, 2911, 77 L.Ed.2d 509 (1983). This suit became known as the *Orr Ditch* litigation. In 1926, the district court entered a temporary restraining order that outlined the *Orr Ditch* parties' water rights on an experimental basis.

Later in 1926, the Secretary and the newly founded TCID entered into a contract that gave TCID operational control of the Newlands Project. Paragraph 34 of the contract permitted the Secretary to enact reasonable rules and regulations to carry out the contract. Furthermore, paragraph 32 authorized the Secretary to terminate the contract for any breach of the contract or the regulations adopted under it.

In 1934, a severe drought stimulated interest in settling the *Orr Ditch* litigation and ending the 1926 temporary restraining order. 103 S.Ct. at 2912. At that time, TCID (rather than the federal government) represented the interests of the Newlands Project. In 1935, the Truckee River water users (i.e., the parties to the *Orr Ditch* litigation) reached a settlement referred to as the Truckee River Agreement. In 1944, the district court issued a final decree that ended the *Orr Ditch* litigation. *United States v. Adams (Orr Ditch)*, Equity Docket No. A3 (D.Nev. Sept. 8, 1944). This "*Orr Ditch* Decree" specifically incorporated the Truckee River Agreement as a portion of its holding. *Id.* at 86, 88.

The Tribe became increasingly dissatisfied with the amount of water being delivered to Pyramid Lake. In a 1970 D.C. District Court suit, in which TCID was not a party, the Tribe claimed that the Secretary's Newlands Project regulations allowed TCID to divert more than its legally recognized share of the water to the project and that water was being wasted because the regulations permitted inefficient operation. *See Pyramid Lake Paiute Tribe of Indians v. Morton (Tribe v. Morton)*, 354 F.Supp. 252 (D.D.C.1972 & 1973). The D.C. District Court found that

the Secretary's regulations were improper, in part because they permitted TCID to divert too much Truckee River water. The court instructed the Secretary to propose regulations that would either insure that 385,000 acre feet of water per year would enter Pyramid Lake or be accompanied with a detailed explanation of why this level could not be reached. *Id.* at 258. The court rejected the regulations submitted by the Secretary, however, and directed the Tribe to enter proposed regulations. The court ultimately adopted a modified version of the Tribe's proposed regulations and ordered the Secretary to publish these regulations in the Federal Register. *See* 354 F.Supp. at 260–66. These regulations (or "operating criteria") allow TCID to divert a maximum of 350,000 acre feet of water for the first water year they were in effect and a maximum of 288,129 acre feet per year thereafter. *Id.* at 261. The regulations also contain several provisions designed to promote efficiency. In addition, section D(1) of the regulations apparently requires the Secretary to terminate the 1926 contract giving operational control of the project to TCID if TCID engages in a substantial violation of the regulations. *Id.* at 265.

In June of 1973, during the first year the new regulations were in effect, TCID intentionally violated them by diverting more water than the regulations permitted.[1] The Secretary notified TCID that, as a result of TCID's violation of the operating criteria, he intended to terminate the contract and resume control over the project. TCID filed the instant suit to prevent the Secretary from terminating the contract and to have the 1973 operating criteria declared invalid. In 1983, the district court denied recovery. TCID filed this appeal.

On appeal, TCID claims that it owns a right to a portion of the Truckee River's water and that this right was taken from it without due process of law by *Tribe v.*

*Morton,* the operating criteria accepted by the Secretary as a result of the *Tribe v. Morton* litigation, and the district court's decision in the instant suit. We reject those contentions. We find, first, that TCID does not own any right to a portion of the Truckee's water, but, rather, merely had the right to manage the Newlands Project. Second, we find that the *Tribe v. Morton* decision did not interfere with TCID's right to manage the project. Finally, we affirm the district court's holding that the Secretary properly terminated the contract when TCID violated the operating criteria.

## II.

### THE NATURE OF TCID'S RIGHTS

Under the terms of the 1926 contract between TCID and the Secretary, TCID had the right to manage the Newlands Project. If this right to manage the Project was taken from TCID in the *Tribe v. Morton* suit, TCID's property, this right to manage, may well have been taken without due process of law because, as already pointed out, TCID was not a party to the *Tribe v. Morton* suit. But this would not be true if this right to manage was unaffected by *Tribe v. Morton.* Thus, the critical question in the instant suit is whether TCID's right to manage the Newlands Project has been interfered with by *Tribe v. Morton.*

### A. *Absence of Water Rights.*

◼ As a water district responsible for managing a reclamation project, TCID does not directly own any water rights. Rather, the landowners within the service area irrigated by the Newlands Project own water rights. The *Tribe v. Morton* court stated that it was not interfering with these water

---

1. TCID admits that it diverted more water than the operating criteria permitted. TCID may have violated other provisions in the operating criteria, but it does not admit any other violations. Because we find that TCID's violation of the operating criteria's diversion limitation authorized the Secretary to terminate the contract, we do not reach the issue of whether TCID violated other provisions of the operating criteria.

rights.[2] Even if that court did interfere with these water rights, TCID has no Fifth Amendment claim based on this interference because it would not have lost any property as a result of this interference. Only those who would have lost property, the owners of land with water rights, could claim a deprivation of property without due process.

In an attempt to demonstrate that it owns water rights, in addition to its right to manage the Newlands Project, TCID asserts that the Truckee River Agreement gives it a water right to a portion of the diverted flow of the Truckee River. We disagree. The assertion rests on a misinterpretation of the Truckee River Agreement. It is true that the Truckee River Agreement, which was incorporated into the *Orr Ditch* decree, gave TCID the right to dispose of a portion of the diverted flow of the Truckee River that reached Derby Dam. It did not give TCID any property rights in the flow, however. TCID's rights were strictly managerial. It had no right to the water itself. Thus, the reduction in the amount of water that could be diverted as required by the *Tribe v. Morton* decision and the operating criteria took no property from TCID.

B. *Management Rights.*

■ Nor was TCID's right to manage the Newlands Project interfered with by *Tribe v. Morton.* TCID's right to manage the Newlands Project was never unrestricted. The 1926 contract, for example, explicitly stated that the Secretary had the authority to adopt regulations concerning the operation of the project and that he could terminate the contract if the regulations were violated. Thus, TCID's contractual right to operate the project was taken from it only if *Tribe v. Morton* or the operating

criteria further diminished its right. That did not happen. TCID's rights, both before and after *Tribe v. Morton*, were limited to those of managing the project as long as the Secretary's regulations were followed.

The *Tribe v. Morton* decision, of course, reduced the amount of water TCID was authorized to divert. But TCID had no water rights. Only the nature of its managerial duty was affected. This does not amount to a taking of property without due process.

TCID also asserts that the *Tribe v. Morton* court improperly forced the Secretary to adopt the operating criteria without allowing him to exercise his administrative discretion. By this argument TCID is once again asserting that it was harmed because rights belonging to others were infringed. The Secretary was the proper party to assert that the operating criteria were improperly forced upon him by the *Tribe v. Morton* court. The Secretary had the opportunity to make these arguments in the *Tribe v. Morton* litigation. Moreover, he chose not to appeal the *Tribe v. Morton* decision. Thus, he lost the opportunity to make these assertions. As a result, the operating criteria are now the regulations of the Secretary. The Secretary is enforcing them as his own in the instant suit. TCID may not like them; however, their imposition violates no Fifth Amendment right of TCID.

III.

THE DISTRICT COURT DECISION ON TERMINATION OF THE CONTRACT

The district court held that this suit was within its jurisdiction, that the adoption of the operating criteria (including the reduction in total diversions) was within the Sec-

---

**2.** The *Tribe v. Morton* court explicitly stated that the operating criteria implemented by the Secretary must give proper weight to the water rights outlined in the *Orr Ditch* and *Alpine* decrees. 354 F.Supp. at 260. (The *Alpine* litigation was an adjudication of the water rights on the Carson River, just as the *Orr Ditch* litigation was an adjudication of the water rights on the Truckee River. An interim restraining order entered in

1952 controlled the *Alpine* dispute until 1980. In 1980, the district court entered a final disposition of this suit. *United States v. Alpine Land & Reservoir Co.,* 503 F.Supp. 877 (D.Nev.1980). The Ninth Circuit essentially affirmed this disposition. *See United States v. Alpine Land & Reservoir Co.,* 697 F.2d 851 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).

**532**

retary's authority, and that the Secretary's termination of the contract did not deprive TCID of its constitutional rights. We agree with each of these conclusions.

**A. Jurisdiction.**

 Because TCID claims that the operating criteria and the Secretary's termination of the contract deprived it of property in violation of the Fifth Amendment to the Constitution, this suit is within the district court's federal question jurisdiction. *See* 28 U.S.C. § 1331. Sovereign immunity is not a bar to this suit because 5 U.S.C. § 702 waives sovereign immunity for suits against federal agencies and agents where relief other than monetary damages is sought. Thus, the district court properly reached the merits of the dispute.

**B. Authority to Adopt Operating Criteria.**

The Secretary did not exceed his authority when he adopted the operating criteria. In the 1926 contract, the Secretary explicitly reserved the right to issue regulations governing the operation of the Newlands Project. This reservation allowed the Secretary to issue the regulation restricting the amount of water that would be diverted. Similarly, even if the operating criteria were more restrictive than similar conditions under the 1926 contract, this change was within the Secretary's authority.

The Secretary's promulgation of the operating criteria was neither arbitrary nor capricious. *See* 5 U.S.C. § 706(2)(A). The criteria were adopted under the direction of the *Tribe v. Morton* court after the court and the Secretary considered the Secretary's obligations to TCID, to the water rights' owners, and to the Tribe. *See* 364 F.Supp. at 255. After "consider[ing] whether the [promulgation of the operating criteria] was based on a consideration of the relevant factors and whether there has been a clear error of judgment," as required by *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), we cannot say that the promulgation of the operating criteria was arbitrary or capricious.

**C. Termination of the Contract.**

Finally, the Secretary's termination of the contract following TCID's violation of the operating criteria did not deprive TCID of property without due process of law. TCID readily admits that it violated the operating criteria by diverting more water than the criteria permitted. The 1926 contract explicitly gave the Secretary the right to terminate the contract if TCID violated regulations concerning the operation of the Newlands Project. It did, and the Secretary exercised his right to terminate. That was the agreement and we see no reason why TCID should not be required to abide by it.

AFFIRMED.